The opinion of the Court was delivered by
Todd, J.
The plaintiff, as the child and sole forced heir of the late J. L. Gaston Villars, sues .to annul a conveyance of the property described in the petition, from her deceased father to the defendant, on the ground that the sale was simulated, and was in fact a disguised donation made to a person interposed,, in favor of persons incapable of receiving.
The answer contains the general issue, and a reconventional demand for damages, claimed as resulting from the sequestration of the property in controversy. There was judgment for the defendant, and plaintiff has appealed.
The testimony establishes the following facts :
That plaintiff is the issue of the marriage of the said Villars with his pre-deceased wife, Adele Omer Fortier, and the only child of that marriage that survived her father j that after the death of his wife, Villars lived for many years in open concubinage with a colored woman, formerly his slave, by whom he had several children; that one of these children became the concubine of the defendant, and the mother of one, if not two children by him j that Villars, some years before his death, which occurred in 1877, conceived a violent animosity against the plaintiff, his only daughter, probably caused by her repeated remonstrances with Mm about Ms disgraceful mode of life, and her efforts to induce him to abandon it and make Ms home with her. Under this state of feeling, Villars frequently threatened that he would make such a disposition of his property that the plaintiff should receive none of it at his death; that lie would place it beyond her reach; that shortly after making threats of this nature, on one occasion he drew from the hank abo ut $4300, and in three days thereafter made the conveyance in question, for the price stipulated in the act, of four thousand dollars cash in hand paid j that after the alleged sale, he made some improvements on the place at *199 Ids own expense, paid taxes thereon up to the time of his death, and 'before his death moved on the place and died there; after the alleged sale of the property in question, he sold the residue of his property for •cash, and at his death nothing was found in his name to be inventoried as comprising his estate, the possession of the property in controversy being claimed by the defendant and occupied by the former concubine of the deceased, and his illegitimate children, and descendants, at the time of and since his death.
It was shown, that at the time of the alleged purchase of the property, the defendant was a butcher, doing a small business, and had pursued this occupation for several years previous thereto, and his occupations before, had been those of wood chopper and gardener. His ostensible means were always extremely limited, being unable at times to pay the small monthly rent of $15 to $18 for the structure occupied by him as a butcher shop. We have the testimony of his lessor, J. H. Harvey, on this point, as follows:
He was asked if the defendant was punctual in paying Ms rent, his answer was : “ No, he withdrew without giving me proper notice, and owed me $70 unpaid rent.”
When asked what efforts were made to collect the rent, he said: u There were very numerous attempts made, and I threatened to bring suit a great many times, he always plead that he had no money * * he was invariably short of money all the time he had the shop.”
Asked as to the business done by defendant, whether lucrative or not, the witness answered: “ Enough to support a man’s family, that was about all.”
And, in regard to defendant’s habits, he said : “ He was very loose in his habits, as far as being so with the little money he had.”
And as to his credit, the witness stated: “ I suppose he eould command a credit of $75 or a $100, about the magnitude of any crediting he eould get. I would not do it myself.”
Question. “ Do you think he was a man that had any such sum as $4000.” Answer. “ I don’t think he ever had.” And in reply to a question whether he could have borrowed that sum, he answered: “ No, he could not to my personal knowledge.”
To the same effect, substantially, is .the testimony of Nicholas Harvey and E. Brou, the first named the son and the latter the agent of J. H. Harvey, whose testimony we have quoted above. In fact, all the witnesses concur that the defendant was a man of small means, and none of them show that at any time he was known to have a sum of money exceeding a few hundred dollars.
From the nature of the defendant’s business, and the character of the man, as disclosed by the testimony, it is in the highest degree improb *200 able that defendant could have had so large a sum of money and no-one been cognizant of the fact. If it were a fact, it is much more likely that it would have been notorious in the little community in which he lived. We believe that he was disposed to pay his debts when he could do so, and Ms failure to do so was owing to Ms not having the money to pay with. He was the tenant of Mr. Harvey, the first witness named above, for several years before and one year after the alleged sale.
Against this array of facts and circumstances referred to, amounting; to such strong presumptive evidence, and supported as it is by direct testimony, as we have seen, we have nothing besides the unsupported testimony of the defendant himself. We cannot give it the weight and effect claimed for it. To our mind it is plain that the sale in question was but a device, a part of a scheme deliberately planned and long matured, prompted by an unnatural and undeserved hatred of a father towards Ms daughter, to deprive her of all part or portion of Ids-estate. The money displayed before the notary and witnesses at the time of the pretended sale, as representing the price paid, was doubtless the very money drawn from the bank by Villars for this express purpose.
We can come to no other conclusion than that the sale was a simulation ; that it did not and was never intended honestly and legally to-transfer the property to the defendant, but in reality, was a disguised! donation, for the benefit of the parties named above. Nor is there any inconsistency, as charged, between the allegations, that the sale was. simulated and that it was a disguised donation. The allegations are, in effect, that there was no sale, that what purported to he a sale was a mere simulation, and that the pretended sale, in fact, was a donation, in disguise.
The concubine of the donor and his illegitimate children, for whose benefit the act was entered into, were incapable of receiving from the deceased by- donation the property in question, and the act was an attempt to contravene the positive provisions of the law, and were therefore null. Art. 1486 C. C., declares: “When the natural father has not left legitimate children, or descendants, the natural child or children acknowledged by him may receive from Mm by donation inter vivos or mortis causa, to the amount of the following proportions,’’ etc.
In this case there was a legitimate child, and besides, there is no-proof of a legal acknowledgment of the illegitimate children by the deceased. Art. 1481: “ Those who have lived together in open concubinage are respectively incapable of making to each other, whether inter vivos or mortis causa, any donation of immovables,” etc.
*201 C. C. Art. 1491: “ Every disposition in favor of a person incapable of receiving, shall be null, whether it be disguised under the form of an onerous contract, or be made under the name of persons interposed.” Bennett vs. Cane, 18 A. 590.
It is therefore ordered, adjudged and decreed, that the judgment appealed from be annulled, avoided and reversed, and it is now ordered, adjudged and decreed, that the conveyance of the property described in the petition, from Jean Louis Gaston Villars to Louis Eaivre, by act of the 6th February, 1873, be and the same is hereby annulled, and the said property is decreed to belong to the plaintiff, and that she be put in possession of the same, costs of both courts to be paid by the defendant and appellee.
Rehearing refused.